(No. 84-CC-3301—)

JOHN L. GRIEVES AND GRIEVES CONSTRUCTION Co., Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed August 19, 1987.*

JAMES L. BRUSATTE, for Claimants.

NEIL F. HARTIGAN, Attorney General (JENNIFER DOVER, Assistant Attorney General, of counsel), for Respondent.

RAUCCI, J.

This is an action brought by Claimant for damages for an alleged breach of contract.

On April 30, 1982, bids were opened at the office of Starved Rock State Park for carpentry work for the period of July 1, 1982, through June 30, 1983.

The work to be performed under the contract was defined in the request for bids as follows:

"2. Services generally may be defined as preventative maintenance services, routine repair services, and emergency repair services."

There were two bids. Edward J. Muhich bid $26.00 per hour for labor and 15% above cost of materials, while Claimant, John L. Grieves (also known as Grieves Construction Company) bid $17.00 per hour for labor and 5% above cost of materials. (Resp. Ex. 1).

Claimant was awarded the contract, and subsequently the contract was extended for another year, through June 30, 1984. No written contract documents were ever signed, but see the following in Respondent's answer to Claimant's interrogatories:

"*Interrogatory No. 7:* Did the State of Illinois have any contracts with the claimant, Grieves Construction Company during the years 1982-1983 and 1983-1984? If the answer to the above is yes, then:

A) State the precise nature of each contract and describe the work to be done thereunder;

B) Provide the date each contract was entered into and its duration;

C) Provide the times and dates Grieves Construction Company was called to perform work under said contract."

*Answer to interrogatory No. 7:*

"Yes

A) Carpentry preventive maintenance services, routine repair services and emergency repair services.

B) Fiscal year 1983 from July 1, 1982 to June 30, 1983 signed April 30, 1982;

Fiscal Year 1983 from July 1, 1983 to June 30, 1984 signed May 10, 1983.

C) None."

Thus, for the purposes of this case, whether or not the State actually entered into a contract with Claimant is not an issue. Respondent has conceded that a contract exists.

The language appearing at the bottom of the certification of the opening of the bids reads:

"Amount to Encumber for this Trade Starved Rock: $1,000

Matthiessen: $ 500"

Thus, it is clear that no work could be performed under the contract that would involve an expenditure in excess of $1,000.00 at Starved Rock and $500.00 at Matthiessen.

The explanation for this limitation can be found in section 6(5) of the Illinois Purchasing Act (Ill. Rev. Stat.,

ch. 127, par. 132.6 (5)), the Department of Conservation Physical Operations Handbook (referred to in testimony but not introduced into evidence), and the Comptrollers Uniform Statewide Accounting System.

Mr. Bobby Ray Wise, procurement and operations officer for the Department of Conservation, summarized these purchasing limitations as follows:

"We have certain in house limits that we have in our general services or physical operations handbook., And those are stated to our site managers, number one. In that particular handbook it indicates to the site people that you can go up to $1,000 on their own. Site people with approval of the regional land managers can go up to $2,500. Anything over $2,500 that had to be approved by the Springfield office. And at that time a Cod form, C-o-d, or comptrollers obligation document have to be filed with those folks. Anything over and above those amounts up to $5,000 can be filed after it has been advertised in a case like this and obligated with the comptroller with no problems. That is for a single project. Any project over $5,000, but not exceeding ten has to be advertised, also. No project over $10,000 can be handled by the Department. At that time the Capital Development Board takes over. And they have to advertise the contract or with their authority they could authorize it back to the Department under their jurisdiction and sign off." (Tr. 120-21).

In addition to entering into a maintenance contract with Claimant in the spring of 1982, the Department of Conservation began the paperwork required to replace 82 windows at the Starved Rock State Park Lodge at an estimated cost of $25,000.00 for the windows.

Thus, by letter of June 22, 1982, the Department of Conservation wrote a letter to the Capital Development Board requesting the Capital Development Board to fund the project in the amount of $25,000.00.

An undated project description form (Resp. Ex. 15) prepared by Mario Vitale, states:

"We need to replace the windows in the guest rooms of the lodge because the window frames are deteriorating and do not close properly. The windows are to be replaced by the Regional Hot Shot Crew."

The form has a section for methods of execution, reproduced below:

## EXECUTION METHOD

 x Purchase Materials/DOC Construct
___ Purchase Materials/Contractor Construct
___ Contractor Furnish Materials, Labor & Construction

The foregoing indicates that the Department did not contemplate that an outside contractor would perform the labor of installing the windows. Rather, it was contemplated that the installation would be done by Department of Conservation Personnel. This is corroborated in Respondent's exhibits 14 and 18. Exhibit 14 reads:

"June 29, 1982

Mr. Thomas Madigan, Director of Operations
Capital Development Board
3rd Floor, Wm. G. Stratton Bldg.
Springfield, Illinois 62706

RE: Starved Rock Lodge—Window Replacement $25,000

Dear Mr. Madigan:

The Illinois Department of Conservation desires to program this project as a purchase, DOC construct. It is felt this is the most viable alternative due to the following:

1. The region's carpenter staff is located at the Starved Rock site. This crew is capable of doing this work and their proximity to the site will cut the cost of construction.

2. Utilizing DOC's crew and a purchase will result in the maximum number of windows being installed at the cheapest cost. Two years ago the A/E on the rehabilitation project estimated the cost of this work at $42,000. When inflation contingencies and A/E fees are added to this figure a savings of at least 50% should be realized by executing this project as proposed.

Please advise if additional information is required.

Sincerely,

Robert E. Corrigan, Chief
Division of Technical Services"

By letter dated July 6, 1982, the Capital Develop-

ment Board approved the project as outlined by the Department of Conservation.

### Mr. Wise gave the following pertinent testimony:

"MS. DOVER: Do you have personal knowledge as to what classifications the project at Starved Rock was given?

A. Yes, it was a permanent improvement project due to the size, type and extent and funding source from which it was paid.

Q. Could you explain that more fully for the Court?

A. Okay, Number One, because the amount exceeded $10,000 for the scope of the work, the Capital Development Board became involved in the project, thus the funding source had to come from them. It was Capital Development Board bond funds that were used. And the scope of work originally called for an estimated cost of approximately $42,000. Due to the size and nature of the project our engineering technical services personnel wrote a letter to Mr. Tom Madigan. He is the Director of Operations with the Capital Development Board. And asked them due to the size of the project and the fact that there would have to be an architect, engineer, feasibility fees, a lot of overhead costs involved, could the Department of Conservation execute a purchase through central management services and have DOC personnel do the construction. As a result, Mr. Madigan wrote a letter back stating that he would, in fact approve that, and signed a letter to that effect in which we would execute the purchase. And that resulted in our specifying the windows from their source and in turn using personnel services dollars for the labor involved." (Tr. 126, 127)

Nevertheless, in spite of the foregoing, on March 7, 1983, Robert Kleczewski, Superintendent at Starved Rock State Park, called Claimant to come to the park to discuss the work that would have to be done to install the 82 windows which had arrived and which were smaller than the window openings. The matter is set forth in Claimant's brief:

"The meeting with Mr. Kleczewski at the Lodge began shortly after lunch. (R27). According to Mr. Grieves, Mr. Kleczewski informed the Claimant that the Department of Conservation wanted Grieves Construction Company to install some windows that the State had purchased. (R28). Particularly, Mr. Kleczewski told Mr. Grieves that he wanted him to install the windows on a time and material basis as under the contract in existence. (R28). Mr. Grieves and Mr. Lahey went into some detail with Mr. Kleczewski as to how the job would be performed. This was pursuant to Mr. Kleczewski's request. (R28). Mr. Grieves and Mr. Lahey began preliminary measurements and specifications for the job at the meeting. (R29). Claimant's Exhibit #3 was testified to and admitted into evidence. This exhibit

consisted of the hand written notes and specifications regarding the carpentry work in question made by the Claimant, himself, while inspecting the job with Mr. Kleczewski during the meeting at the Lodge. Said preliminary specifications and drafting was testified to in detail by the Claimant. (R29-34). The date of the document was March 7, 1983. Mr. Grieves then testified that Mr. Kleczewski informed him that he would be getting back in touch with Mr. Grieves to tell him when he wanted to start installing the windows. (R34). Further, Mr. Kleczewski, at no time, indicated that Claimant's obtaining the job was contingent on anything nor was Claimant asked to provide an estimate. (R35). Mr. Grieves specifically stated that Mr. Kleczewski informed him that the work would be done under a time and material basis pursuant to the contract Grieves Construction Company had with the State of Illinois. (R35)." (Claimant's Brief 6).

In addition, Muhich Construction Company, under date of March 4, 1983, submitted a bid in the amount of $24,306.00 to do the labor to replace the windows.

Claimant heard nothing further from Mr. Kleczewski. About four or five weeks after the March 7, 1983, meeting, Claimant called Mr. Kleczewski to find out when he would get started. Mr. Kleczewski said he would get in touch with him.

Late in May 1983, Claimant learned that two of Mr. Muhich's carpenters had been put on the payroll of the Department of Conservation to do the job. One was being paid $15.78 an hour as carpenter foreman and the other was being paid $15.03 per hour as carpenter. The total wages paid to the two men, as employees of the Department of Conservation from May 2, 1983, to June 16, 1983, came to $9,119.76.

If Mr. Grieves had done the work at $17.00 per hour the cost to the State would have been greater.

The windows themselves cost $12,927.33, a figure exceeding the limits established by the comptroller for routine maintenance work.

Mr. Wise testified:

"Q. And does the cost provided, the cost mentioned in that purchase order,

does that cost exceed the limits established by the comptroller for routine maintenance work?

A. Yes, it would.

Q. Do you have any personal knowledge as to how the labor portion for this project was handled?

A. Yes, I do. Through the records, two individuals were hired and put on the personnel services payroll for the period of time necessary to complete this project.

Q. Do you know out of what fund the labor was paid?

A. Paid out of the personnel services account. I don't know the specific fund, that being general revenue versus state park fund, but it was a payroll as opposed to a contractual service arrangement. In that case their benefits, taxes were withheld, paid into a retirement system. All the things that any State of Illinois employee would do." (Tr. 128)

Claimant argues that in putting two carpenters on the State payroll to install the windows, the State breached its contract with him. His case is without merit.

The certificate of the opening of the bids show on its face that the cost of any work done under the contract could not exceed $1,000.00 for Starved Rock and $500.00 for Matthiessen. The comptroller's regulations and the Illinois Purchasing Act make clear that a project involving labor costs of $9,119.76 could not have been performed under Claimant's contract. The Department of Conservation correspondence indicates that from the outset, the labor was to be done by persons on the Department payroll. Further, under the comptroller's regulations, the work was not maintenance but renovation. Mr. Kleczewski was totally in error in giving Claimant to understand that he could do the work under his contract.

Claimant argues, however, that the officials at the park should have attempted to honor his interpretation of the contract by putting him and his employee on the payroll rather than making State employees out of the employees of his competitor. Nothing in the contract or law required such action.

It is therefore ordered, adjudged and decreed that this claim be, and hereby is denied, with prejudice.